## UNITED STATES DISTRICT COURT
### FOR THE
### NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| LYNK LABS, INC., | ) |
| | ) |
| *Plaintiff*, | ) Civil Action No.: 16-cv-4636 |
| | ) |
| v. | ) |
| | ) |
| | ) **JURY TRIAL DEMANDED** |
| SCHNEIDER ELECTRIC USA, INC., | ) |
| | ) |
| *Defendant*. | ) |
| | ) |

## THIRD AMENDED COMPLAINT

Plaintiff Lynk Labs, Inc. ("Lynk Labs"), for its complaint against Defendant Schneider Electric USA, Inc., ("Schneider") hereby demands a jury trial and alleges as follows:

### NATURE OF THE ACTION

1.     This is a civil action for patent infringement arising under the patent laws of the United States, 35 U.S.C. § 100, *et seq.*, for correction of inventorship pursuant to 35 U.S.C. § 256, and for breach of contract.

### THE PARTIES

2.     Lynk Labs is a corporation incorporated in the State of Illinois with its principal place of business at 2511 Technology Drive, Suite 108, Elgin, IL 60124. Before then, Lynk Labs' principal place of business was 585 Tollgate Road, Suite E, Elgin, Illinois 60017.

3.     On information and belief, Schneider is a corporation incorporated in the State of Delaware with a principal place of business at Boston One Campus, 800 Federal Street, Andover, MA 01810.   On information and belief, Juno Lighting LLC was a wholly-owned subsidiary of Schneider Electric USA, Inc. ("Schneider") until approximately December 10, 2015.

4.     On information and belief, Acuity Brands Lighting, Inc. (together with Acuity Brands, Inc., "Acuity") acquired all equity interests of Juno Lighting LLC by at least December 10, 2015.

5.     On information and belief, Schneider, during the time it owned Juno Lighting LLC, was engaged in the business of designing, manufacturing, and selling lighting systems and related components in this District.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).   Pursuant to 28 U.S.C. § 1367, this Court also has supplemental jurisdiction over the breach of contract claims asserted herein because those claims are so related to the claims brought under the patent laws as to form part of the same case or controversy.

7.     This Court has personal jurisdiction over Schneider pursuant to 735 ILCS 5/2-209 at least because Schneider was the corporate parent of Juno Lighting, LLC and Juno Manufacturing, LLC (collectively "Juno"), whose principal place of business is in the State of Illlinois, at all relevant times to this litigation up until approximately December 10, 2015, during which time Juno committed the acts described in the Third Amended Complaint in Northern District of Illinios Case No. 15-cv-04833.  Furthermore,

Schneider has a place of business in the State of Illinois, in this District, has committed, and continues to commit, acts of patent infringement in Illinois, including in this District, and transacts business in the State of Illinois, in this District.

8.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)-(d) and 1400(b) because Schneider is subject to personal jurisdiction in this District and has committed, and continues to commit, acts of patent infringement giving rise to the claims alleged herein within this District. Furthermore, the asserted contract was entered into by Schneider's former subsidiary, Juno, in this District, Juno's principal place of business is in this District, and Juno has breached, and continues to breach, the asserted contract in this District.

### THE RELATIONSHIP BETWEEN LYNK LABS AND JUNO

9.    Lynk Labs was founded in 1997 by Mike Miskin, who is and was President & CEO of Lynk Labs. Since its inception, Lynk Labs has been a technology pioneer, challenging industry understanding of conventional physics, beginning with technology in the area of broadband communications.

10.    In 2001, Lynk Labs shifted its focus to developing intellectual property and corresponding products in the field of light emitting diodes ("LED's") driven by existing AC voltage sources, such as mains electricity and/or mains voltage transformers, the standard AC electric power supply from the grid. At that time, the lighting industry concentrated primarily on the development of lighting products and, more specifically, LED products, driven by DC power supplies. Typically, to power LED's, DC power supplies were created by expensive and cumbersome semiconductor solutions that converted the AC power supplied by the mains. The conventional wisdom at the time

was that using an AC voltage source to drive an LED product was an unreliable and unworkable approach. Lynk Labs' pioneering research cut directly against that conventional wisdom, resulting in inventions now common in the industry about a decade later.

11. Lynk Labs was, and still is, a small startup in Elgin, Illinois. To commercialize its revolutionary ideas in the field of LED lighting, Lynk Labs needed additional resources. From approximately 2002 to 2006, Mr. Miskin sought a business partner, and, to that end, engaged in multiple confidential discussions, all governed by respective confidentiality agreements, with various third parties, including Juno.

12. On January 23, 2006, in order to evaluate a potential business relationship, Lynk Labs and Juno signed a Mutual Nondisclosure Agreement (the "Agreement"), a true and correct copy of which is attached hereto as Exhibit A. The purpose of the Agreement was to prevent confidential information communicated between the parties from being misused. On information and belief, counsel at Schneider, Juno's corporate parent at the time, reviewed and approved the Agreement.

13. Section 1 of the Agreement defines confidential information as:

> [A]ll information, whether written or oral, and in any form (including, without limitation, patent applications, engineering documents, research and development manuals, reports, designs, drawings, plans, flowcharts, software (in source or object code), program listings, data file printouts, printed circuit boards, methods, processes, component part listings, product information, new product plans, sales and marketing plans and/or programs, pricing information, customer lists and other customer information, financial information and employee files or other employee information) relating to either party's business or technology which is disclosed by such party either directly or indirectly to the other party.

14. Additionally, Section 1 of the Agreement states:

> In addition, Confidential Information shall also include the following information: from Lynk Labs: AC-LED Assemblies, Devices and Drive Technology.

15. Section 3 of the Agreement limits each parties use of confidential information:

> The parties agree to use the Confidential Information received hereunder solely for the purpose of evaluating a business relationship.

> The recipient agrees to use the Confidential Information only to the extent necessary to engage in such discussions.

16. Section 5 of the Agreement further describes the parties' obligations of maintaining confidentiality:

> Each party agrees that, for a period of five (5) years from receipt of Confidential Information from the other party hereunder, it shall use the same degree of care and means that it utilizes to protect its own information of a similar nature, but in any event not less than reasonable care and means, to prevent the unauthorized use or the disclosure of such Confidential Information to third parties. The Confidential Information may be disclosed only to employees or contractors of a recipient, and the advisors, officers, directors, managers, members, stockholders and affiliates of recipient with a "need to know" who are instructed and agree not to disclose the Confidential Information and not to use the Confidential Information for any purpose, except as set forth herein[.]

17. Further, Section 5 requires:

> Recipient [of confidential information] shall have appropriate written agreements with any such employees or contractors sufficient to comply with the provisions of this Agreement. A recipient may not alter, decompile, disassemble, reverse engineer, or otherwise modify any Confidential Information received hereunder and the mingling of the Confidential Information with information

of the recipient shall not affect the confidential nature or ownership of the same as stated hereunder.

18.      Section 11 of Agreement provides:

The parties agree that there is no adequate remedy at law for any breach of the obligations hereunder and upon any such breach or any threat thereof by either party the other shall be entitled to appropriate equitable relief, including injunctive relief in addition to whatever other remedies it might be entitled.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable attorney's fees, court costs and related expenses from the other party.

19.      Pursuant to Section 7 of the Agreement, the Agreement was to expire on January 23, 2007, though it requires "[t]he obligations of confidentiality set forth hereunder shall survive such expiration for a period of Five (5) years beyond any earlier termination as set forth above."  However, on April 4, 2008, Lynk Labs and Juno signed a Ratification Of The Continuation And Extension of the Agreement (the "Extension"), a true and correct copy of which is attached hereto as Exhibit B.  The Extension states:

[The Agreement] is hereby ratified and deemed to have been continued in effect…to the present and further shall extend and continue to be effective until it now expires on January 23, 2009.

20.      During the effective term of the Agreement, Lynk Labs provided confidential information to Juno, including at least: technical knowhow concerning design and manufacture of AC-driven LED lighting products and components, such as AC electronic drivers, AC-driven LED circuits, and AC-driven LED circuit board assemblies, that could be incorporated into LED lighting systems including, for example, linear track lighting systems; a business plan/roadmap for commercial implementation of AC-driven LED products; technical knowhow concerning various forms of AC-driven

6

LED circuits, including design considerations concerning the proper spatial separation of LED's in LED products and parallel AC-driven LED circuit designs for modularity in LED circuit board assemblies; and the wedge-shaped emitter area of an LED circuit board assembly housing.

21.     Initially, in 2006, Schneider evaluated Lynk Labs' value with an eye towards a partnership with Lynk Labs and/or as a target for an investment. Schneider's interest in Lynk Labs and its coordinated evaluation of Lynk Labs' potential as a business partner continued throughout at least 2007. Indeed, on information and belief, Schneider directed Juno's intellectual property strategy throughout that time, including their strategy with respect to Lynk Labs.

22.     Subsequently, Lynk Labs and Juno had a productive business relationship and potential for a mutually beneficial partnership. By the end of 2007, Mr. Miskin and then Lynk Labs' employee James Andersen assisted with design, development, and commercial implementation of a fixture that became a key element of Juno's first LED lighting product. The design, enabled by Lynk Labs' development of AC-driven technologies and including an LED circuit board assembly designed by Lynk Labs, allowed the fixture to be easily incorporated into Juno's existing Trac 12 lighting systems.

23.     Lynk Labs also collaborated with Juno on the design of ornamental and practical features of LED lighting products marketed with the Trac 12 lighting systems, including Mr. Miskin's communication, to Juno, confidential information concerning the design of a wedge-shaped emitter area and other design elements in LED circuit board assembly housing, which ultimately enabled incorporation of such LED lighting

products, including the fixture described in Paragraph 22, into the tracks of the Trac 12 lighting system.

24.     Release of the fixture quickly led to Juno's request, of Lynk Labs, for a second-generation fixture for use in its Trac 12 lighting systems.  Again, Lynk Labs collaborated with Juno, communicating and leveraging its technical knowhow concerning design and manufacture of AC-driven LED lighting products and components, including design of a compatible circuit board assembly, to help deliver a second-generation fixture.

25.     When the original fixture was set to launch, Juno forecasted sales of approximately 30,000 pieces of the fixture in 2008.  Exceeding all expectations, Juno sold approximately 30,000 pieces in January of 2008 alone, ultimately purchasing a total of approximately 300,000 pieces of the original and second-generation versions of the fixture from Lynk Labs in 2008.

26.     Release of the original fixture, enabled by Lynk's technical knowhow, was Juno's best-ever product launch at that time.  The lighting industry took notice.  In March 2008, Juno was given an award recognizing the innovation of the second-generation fixture: Electrical Construction & Maintenance magazine declared Juno's LED linear lighting the lighting fixture of the year.  A copy of the magazine's online announcement of the award is attached hereto as Exhibit C.

27.     At that time, Lynk Labs reasonably expected it would flourish as a result of having been the leader and mover behind consensus revolutionary technology.  Lynk Labs hoped that it would have a long partnership with Juno and continue to supply, among other products being developed by Lynk Labs at Juno's request, the circuit board

assemblies for the second-generation fixture and its later iterations. But Lynk Labs' expectations were short-lived, soon thereafter sabotaged by Schneider.

28. In or around April 2008, Lynk Labs put Juno on notice of Lynk Labs' pending patent applications concerning AC-driven LED technologies. Indeed, on April 21, 2008, David Early, then Juno's LED Program Manager, emailed multiple employees of Juno regarding the "need to discuss the use of AC [d]rivers to run the Lynk Labs modules ASAP." He warned: "Lynk [Labs] has patent applications on the technology[.]" A true and correct copy of the April 21, 2008 email is attached hereto as Exhibit D.

29. On notice that Lynk Labs was actively pursuing patent protection for its pioneering ideas in the AC-LED space, toward the middle to end of 2008, Juno demanded an exclusive license to Lynk Labs' AC-driven LED technology such that Juno could purchase components from original equipment manufacturers ("OEM's") other than Lynk Labs. Juno's purported concern was that Lynk Labs was too small to meet the market appetite for Lynk Labs' technology. To alleviate Juno's concerns, Lynk Labs consistently offered to negotiate various manufacturing alternatives. Indeed, Lynk Labs, at Juno's request, was already using contracted manufacturing facilities for the manufacture of products for Juno. Lynk Labs made clear that, though Lynk Labs' technologies, much of which were included in pending patent applications, were too valuable to be exclusively licensed, it was willing to consider non-exclusive licensing options to meet Juno's production needs. Lynk Labs believed its openness to arranging additional reliable manufacturing facilities and/or mutually beneficial, reasonable licensing terms would permit a continued manufacturing partnership with Juno.

30.     Despite Lynk Labs' efforts to forge a flexible partnership, the parties' relationship began to sour.  By the end of 2008, Juno began purchasing significantly less product from Lynk Labs.  Lynk Labs became concerned that Juno might try to misuse its confidential information and cut Lynk Labs out of the budding market.

31.     For example, in or around November 2008, Charles Huber, Juno's former Senior Vice President of Engineering and Product Management, and now Lynk Labs' Vice President of Business Development, spoke with Juno management regarding his concerns about Juno's failure to abide by the confidentiality obligations in the Agreement.  On November 12, 2008, Mr. Huber reaffirmed these concerns in an email to Juno's then Vice President of Product Management, a true and accurate copy of which is attached hereto as Exhibit E.  Mr. Huber expressed concern about Juno's unauthorized use of Lynk Labs' confidential information in development and production of a Juno LED circuit board assembly housing.  Mr. Huber also reported that he believed that Juno had improperly sought and received design patent U.S. Patent No. D579,144 (the "'144 Patent"), a true and accurate copy of which is attached hereto as Exhibit F, claiming an exclusive right to a confidential design incorporating significant, confidential contributions from Lynk Labs.

32.     By the beginning of 2009, Juno effectively ceased ordering product from Lynk Labs.  The loss of such a significant customer crippled Lynk Labs' business.

33.     In May 2009, Lynk Labs attended Lightfair International in New York, New York, and examined new product samples from Juno's AC-driven Trac 12 line of products.  Lynk Labs was alarmed to see that Juno had continued to commercialize Lynk Labs' technology, purchasing AC-driven LED circuit board assemblies from alternate

sources, including new AC-driven LED circuit board assemblies that Juno requested, and Lynk Labs did, design, prototype, and quote in high volume for a new product launch.

34.     At Lightfair International, Lynk Labs communicated, to multiple employees of Juno, including Stacy Looney, Juno's then Vice President of Engineering, concerns about Juno's likely violations of Lynk Labs' current and pending patent rights, including patents incorporating use of rectified circuitry as included in the displayed AC-driven Trac 12 products, and breach of the Agreement's confidentiality obligations.  On May 11, 2009, Lynk Labs reaffirmed such concerns in email, noting that "Lynk Labs has approved and pending, published and non-published IP and has shared some of this technology and know-how with Juno Lighting group under [the Agreement]."  A true and correct copy of the May 11, 2009 email is attached hereto as Exhibit G.

35.     On May 21, 2009, Juno, through corporate counsel at Schneider, rebuffed Lynk Labs offer to discuss Lynk Labs' concerns, and instead coldly informed Lynk Labs that it was unilaterally terminating confidential discussions pursuant to Section 7 of the Agreement, and accordingly formally cancelling the Agreement.    Moreover, on information and belief, Schneider's counsel handled all intellectual property disputes between Juno and Lynk Labs stemming from such concerns.

36.     Thereafter, Lynk Labs received no further product orders from Juno. Juno's abrupt exclusion of Lynk Labs nearly destroyed Lynk Labs.  For years, Lynk Labs barely managed financial feasibility, and remains in a precarious position as a consequence of Juno's actions.   Juno, on the other hand, has grown, succeeding in expanding the AC-driven LED business, and, indeed, as envisioned and enabled by Lynk

Labs, encouraging others in the industry to invest in AC-driven LED technologies using Lynk Labs' innovations.

37.     Similarly, the lighting industry was aware of the relationship between Juno and Lynk Labs. Juno's treatment of Lynk Labs, which, on information and belief, Juno communicated to others in the lighting industry, sent a message to the industry that the industry could use Lynk Labs' technology because Lynk Labs was a start up teetering on extinction. That message seriously damaged Lynk Labs, and continues to cause Lynk Labs damage to this day.

38.     As evidenced by the commercial success and industry recognition of Juno's first- and second-generation fixtures, Lynk Labs had developed revolutionary technology and had a significant first-mover advantage in the LED lighting industry. Lynk Labs had a business plan, ultimately implemented by Juno, to exploit their advantage and reap the corresponding financial reward. Instead, Lynk Labs was manipulated by Juno and crushed under the weight of the considerable resources of Juno's multi-national, multi-billion dollar former parent, Schneider.

39.     On information and belief, Juno utilized, and continues to utilize, Lynk Labs' confidential information concerning technical knowhow concerning design and manufacture of AC-driven lighting products and components and technical knowhow concerning various forms of AC-driven LED circuits in development and production of lighting systems that incorporate AC-driven LED's, including at least: its AC-driven Trac 12 line of LED lighting systems; its AC-driven Trac 12/25 line of LED lighting systems; its AC-driven Flex 12 Trac of LED lighting; its AC-driven Solo-Task LED lighting systems; its AC-driven low-voltage Mini LED recessed downlighting systems; its Trac-

Master 120V One Circuit System; Trac-Master 120V Two Circuit System; its Trac-Master 120V Tube System; its Trac-Master 120V Recessed System; and its Trac-Lites One Circuit System.

40.     On information and belief, Juno has directly or indirectly unilaterally shared Lynk Labs' technical knowhow concerning design and manufacture of AC-driven lighting products and components, such as AC electronic drivers, AC-driven LED circuits, AC-driven LED circuit board assemblies, and technical knowhow concerning various forms of AC-driven LED circuits with third party OEM's, such as Carmen Matthew, LLC, (d/b/a "Norlux") (a wholly owned subsidiary of Hubbell Lighting, Inc.), Hatch Transformers, Inc. ("Hatch"), and Citizen Electronics Co., Ltd., ("Citizen"), and has contracted such third party OEM's to produce components of lighting systems that incorporate AC-driven LED's, including at least those listed in Paragraph 39, that utilize such knowhow, including: contracts with Norlux and Citizen to produce LED circuit board assemblies; and a contract with Hatch to produce AC electronic transformers.

41.     On information and belief, Juno followed, and continues to follow, the business plan/roadmap developed by Lynk Labs for commercial implementation of AC-driven LED products. On information and belief, Juno used, and continues to use, the roadmap/business plan to unjustly free ride the first-mover advantage Lynk Labs had earned as a pioneer in the field, including implementation of trade secrets taught to Juno under the Agreement.

42.     On information and belief, Juno utilized, and continues to utilize, confidential information concerning the proper spatial separation of LED's in development and production of its AC-driven Trac 12 line of LED lighting system,

including in at least its Trac 12 LED Mini-Flood fixture, despite earlier requesting that Lynk Labs design and develop the circuit board assembly for the Trac 12 LED Mini-Flood fixture.

43.     On information and belief, Juno has directly or indirectly unilaterally shared Lynk Labs' confidential information concerning the proper spatial separation of LED's with third party OEM's, such as Norlux, to produce LED circuit board assemblies for use in Trac 12 Product Systems, including at least its Trac 12 LED Mini-Flood fixture.

44.     The confidential information concerning the proper spatial separation of LED's is described in U.S. Patent No. 8,841,855 (the '855 Patent), the details of which were not publicly disclosed in a patent application until July 2009.  Upon information and belief, Juno's utilization and disclosure of such confidential information, as described in Paragraphs 42 and 43, occurred prior to July 2009, giving Juno a first-mover advantage it would not otherwise have had.

45.     On information and belief, Juno utilized confidential information concerning the wedge-shaped emitter area of an LED circuit board assembly housing in development and production of LED fixtures incorporating such wedge-shaped emitter areas.

46.     Juno improperly sought patent protection over purported inventions incorporating the confidential information, representing the ideas of Mr. Miskin and Mr. Huber, communicated to Juno, regarding a wedge-shaped emitter area design of an LED circuit board assembling housing in the '144 Patent.

47.     The '144 Patent improperly incorporates such inventive contributions without naming Mr. Miskin or Mr. Huber as inventors.

48.     On information and belief, Juno utilized, and continues to utilize, confidential information concerning the practical design of the LED fixture originally designed for use in tracks of the Trac 12 lighting system, by developing and producing LED fixtures incorporating such design.

49.     Juno improperly sought patent protection over purported inventions incorporating the confidential information, representing the ideas of Mr. Miskin and Mr. Andersen, communicated to Juno, regarding the practical design of the LED fixture originally designed for use in tracks of the Trac 12 lighting system, as described, for example, in Paragraphs 24 through 26.  These ideas are described and claimed in U.S. Patent No. 7,909,499 (the "'499 Patent").

50.     The '499 Patent improperly incorporates such inventive contributions without naming Mr. Miskin or Mr. Andersen as inventors.

51.     Juno improperly sought patent protection over purported inventions incorporating the confidential information, representing the ideas of Mr. Miskin and Mr. Andersen, communicated to Juno, regarding the design of LED circuit board assemblies and their incorporation into the tracks of track lighting systems in U.S. Patent No. 9,121,597 (the "'597 Patent").

52.     The '597 Patent improperly incorporates such inventive contributions without naming Mr. Miskin or Mr. Andersen as inventors.

53.     On information and belief, Juno utilized, and continues to utilize, confidential information concerning the design of LED circuit board assemblies and their

incorporation into the tracks of track lighting systems, by developing and producing LED lighting systems, PCB's, and modules incorporating such design.

54.     The information to which Juno, and Schneider through its former subsidiary Juno, was exposed is of great value not only to Lynk Labs, but also to its competitors who did not, and do not, possess, or have access to, such information. For this reason, Lynk Labs takes reasonable steps to ensure that its information stays confidential. Such measures include regular use of confidentiality agreements when sharing confidential information with third parties, and provision of such information only on need-to-know bases.

55.     On information and belief, Juno has included indemnification provisions in its agreements with third party OEM's because of third party concerns regarding violation of Lynk Labs' intellectual property.

56.     On information and belief, Juno and/or Schneider retained the services of an investment bank in order to sell Juno.  On information and belief, on or around December 10, 2015, Acuity Brands Lighting, Inc. acquired all equity interests of Juno Lighting LLC and, on information and belief, Juno Lighting LLC may no longer exist as a liability company.  In that event, on information and belief, Acuity may have assumed liability for some or all of Juno's debts and liabilities related to this Action.  Additionally, on information and belief, Schneider may be liable for some or all of Juno's debts and liabilities related to this Action.

57.     On information and belief, a significant part of the value paid for Juno was attributable to Juno's use and commercialization of Lynk Labs' confidential information and intellectual property.  Had Lynk Labs been able to fully enjoy its first-mover

advantage, Lynk Labs, rather than Juno, would be in the position of selling itself at a significant premium.

## THE PATENTS-IN-SUIT

*Lynk Labs' Patents*

58.    On April 3, 2012, U.S. Patent No. 8,148,905 (the "'905 Patent"), entitled "AC LIGHT EMITTING DIODE AND AC LED DRIVE METHODS AND APPARATUS," duly and legally issued.  A true and correct copy of the '905 Patent is attached hereto as Exhibit H.

59.    On September 10, 2013, U.S. Patent No. 8,531,118 (the "'118 Patent"), entitled "AC LIGHT EMITTING DIODE AND AC LED DRIVE METHODS AND APPARATUS," duly and legally issued.  A true and correct copy of the '118 Patent is attached hereto as Exhibit I.

60.    On September 23, 2014, U.S. Patent No. 8,841,855, entitled "LED CIRCUITS AND ASSEMBLIES," duly and legally issued.  A true and correct copy of the '855 Patent is attached hereto as Exhibit J.

61.    Lynk Labs owns all rights, title, and interest in and to the '905, '118, and '855 Patents and has the right to sue and recover for past, present, and future infringement.

*Knowledge of Lynk Labs' Patents*

62.    As discussed above, Lynk Labs provided notice to Juno around 2008 that it had sought and was seeking broad patent protection on its technological innovations, some of which are reflected in the '118, '855 and '905 Patents.  At that time, Lynk Labs gave Juno notice that it was using technology that would be covered by U.S. Patent

claims.  On information and belief, Juno and/or its former corporate parent Schneider has/have kept track of Lynk Labs' patent protection including the '118, '855 and '905 Patents.

63.     Likewise, on information and belief, third party suppliers of Juno have requested, and been granted, indemnification regarding Lynk Labs' patent position.  On information and belief, Juno and/or Schneider have continued to analyze Lynk Labs' portfolio, including the '118, '855 and '905 Patents, as a result of such requests for indemnification.

64.     Lynk Labs routinely issues press releases in leading lighting industry magazines, including LEDS Magazine and Solid State Technology Magazine, notifying the industry when a new Lynk Labs' patent issues relevant to Lynk Labs' product offerings and/or the LED lighting industry.

65.     In December 2013, about one month after approval of the '118 Patent, Lynk Labs announced such approval in Solid State Technology magazine, notifying the industry that the '118 Patent encompasses "vertical market segments of AC LED technology from the core AC LED circuits and powering methods to the lighting system level."

66.     On information and belief, personnel at Juno and Schneider read Lynk Labs' press releases, including press releases associated with the '118 Patent.  For example, on February 10, 2009, the date of publication of Juno's U.S. Patent No. 7,489,086, titled "AC LIGHT EMITTING DIODE AND AC LED DRIVE METHODS AND APPARATUS," Lynk Labs emailed Juno a link of an LEDs Magazine article announcing such issuance.  On that same day, Juno's then Vice President of Product

Management responded via email, congratulating Lynk Labs and noting he would "be reading it over to see all of the details." A true and correct copy of the email exchange is attached hereto as Exhibit K.

67. In 2014, its business having been effectively destroyed by Juno and Schneider, Lynk Labs considered selling some or all of its valuable patent portfolio. Lynk Labs hired Aqua Licensing LLC ("Aqua") to advise and present offerings for purchase of Lynk Labs' patent portfolio. Aqua delivered emails to potential purchasers with bidding instructions for the Lynk Labs' offering. Among other materials, the email included access to an Offering Memorandum enumerating, as part of the offered patent portfolio: the issued '905 Patent, issued '118 Patent, and the pending application for the '855 Patent.

68. On February 28, 2014, Aqua, on behalf of Lynk Labs, emailed John Mabbott, then and current President and CEO of Juno, the bidding instructions for Lynk Labs' offering. A true and correct copy of the email is attached hereto as Exhibit L. Moreover, the memorandum offered analysis of representative claims of the '118 Patent, and specifically identified LED lighting products and systems, many of which were and are made and sold by Juno, as infringing the '118 Patent. Mr. Mabbott later responded via telephone that Juno was not interested in acquisition of Lynk Labs' patent portfolio.

69. On information and belief, all information described in Paragraphs 62 through 68 was, if not directly communicated to Schneider by Lynk Labs, communicated by employees at Juno to employees at Schneider, including but not limited to communication to Schneider's counsel as exemplified in Paragraph 35.

## COUNT I – INFRINGEMENT OF THE '118 PATENT

70.     Paragraphs 1 through 69 are incorporated by reference as though fully stated herein.

*Juno and Schneider's Sale of Juno Products*

71.     Juno and Schneider manufacture, use, offer for sale, sell, and export LED lighting systems driven by AC electronic transformers.  On information and belief, such lighting systems include the following Juno line of lighting systems: its AC-driven Trac 12 line of LED lighting systems (the "Trac 12 Product Systems"); its AC-driven Trac 12/25 line of LED lighting systems (the "Trac 12/25 Product Systems"); its AC-driven Flex 12 Trac of LED lighting systems (the "Flex 12 Product Systems") (together with the Trac 12 and Trac 12/25 Product Systems, the "Low Voltage Trac Systems"); its AC-driven Solo-Task LED lighting systems (the "Solo-Task Product Systems"); and its AC-driven low-voltage Mini LED recessed downlighting systems (the "Downlighting Product Systems") (collectively, the "Low Voltage Systems").

72.     On information and belief, the Solo-Task Product Systems include at least the following compatible fixtures: Solo-Task LED Luminaires.

73.     On information and belief, the Downlighting Product Systems include at least the following compatible fixtures: Mini LED Downlights and Gimbals.

74.     On information and belief, Juno and Schneider manufacture, use, offer for sale, sell, and export components of the Low Voltage Systems, including AC electronic transformers for LED circuits, LED circuit board assemblies, LED circuit board assembly housing, corresponding compatible circuitry, and components thereof.  On information and belief, Juno and Schneider manufacture, use, offer for sale, sell, and export

components of the Low Voltage Trac Systems, including lighting tracks ("Low Voltage Systems Tracks").

75.     On information and belief, certain variations of the Trac 12 and Trac 12/25 Product Systems include systems that incorporate at least one LED circuit having at least one LED, driven by an AC electronic transformer, to or from which at least one additional LED circuit can be seamlessly added or removed ("Directly Infringing Trac 12 Systems").  Such Directly Infringing Trac 12 Systems include at least those incorporating compatible variations of the following fixtures: Color LED Linear Module; LED Mini Flood; Low Power LED Module Series; WarmDim LED Linear Lighting Modules; QJ LED Mini Cylinder Display/Picture Horizontal; QJ LED Mini Cylinder Display/Picture Vertical; Quick Jack LED Spot Light – Reno Series; Quick Jack LED Spot Light – Vegas Series; Cylindra 13W LED Spotlight Series; LED Mini-Cylindra Spotlight Gen 2; TL261L Conix II; Dolce Series Pendants; Medium Dome Series Pendants; Tear Drop Glass Series Pendants; Charlotte Series Pendants; Fargo Glass Series Pendants; Long Cone Glass Series Pendants; Medium Cylinder Series Pendants; Onyx Series Pendants; Tube Glass Series Pendants; Cylinder Glass Shade Pendants; Quick Jack 6W LED Cylinder MiniPendant Series; Cylinder LED MiniPendant Series; Flute LED MiniPendant Series; LED Pendant Cordset Series; and Quick Jack LED Pendant Cordset Series.

76.     On information and belief, components of the Trac 12 and Trac 12/25 Product Systems, including LED circuit board assemblies and housing, are often incorporated into fixtures, also manufactured, used, offered for sale, sold, and exported by Juno and Schneider, that are compatible with the Trac 12 and Trac 12/25 Product

21

Systems and compatible with, but not offered for sale, sold, or exported with, LED bulbs ("Trac 12 System Fixtures"), including at least LED-compatible variations of the following fixtures: Festoon Lamp Holders; Rigid Loop Lamp Holders; Wedge Base Single Lamp Holders; Wedge Base Double Lamp Holders; Arc 16; Concentricity 16; Cone 16; Gimbal 16; Lily 16; Disc Shade Pendant; Ellipse Shade Pendant; Flame Glass Shade Pendant; Flute Metal Shade Pendant; RLM Glass Shade Pendant; Short Cone Glass Shade Pendant; Tall Cone Glass Shade Pendant; Flute Glass Shade Short Cone; Teardrop Glass Shade Pendant; Wrap Shade Pendant; and Tall Dome Series Pendant.

77.     On information and belief, certain variations of the Flex 12 Product Systems include systems that incorporate at least one LED circuit having at least one LED, driven by an AC electronic transformer, to or from which at least one additional LED circuit can be seamlessly added or removed ("Directly Infringing Flex 12 Systems") (together with Directly Infringing Trac 12 Systems, Solo-Task Product Systems, and Downlighting Product Systems, "Directly Infringing Low Voltage Systems").  Such Directly Infringing Flex 12 Systems include at least those incorporating compatible variations of the following fixtures: Cylindra LED; MR11 LED Spotlight; Quick Jack LED Spot Light Reno Series; Quick Jack LED Spot Light Vegas Series; TF261L Conix II LED; Dolce Series Pendant; Medium Dome Series Pendant; Tear Drop Glass Series Pendant; Charlotte Series Pendant; Fargo Glass Series Pendant; Long Cone Glass Series Pendant; Medium Cylinder Series Pendant; Onyx Series Pendant; Tube Glass Series Pendant; Cylinder Glass Shade Pendant; Quick Jack 6W LED Cylinder MiniPendant Series; Cylinder LED Mini-Pendant Series; Flute LED Mini-Pendant Series; Flute Glass

Shade Short Cone Metal; LED Pendant Cordset Series; Quick Jack LED Pendant Cordset; LED Mini Pendant Cylinder Series; and LED Mini Pendant Flute Series.

78.     On information and belief, components of the Flex 12 Product Systems, including LED circuit board assemblies and housing, are often incorporated into fixtures, also manufactured, used, offered for sale, sold, and exported by Juno and Schneider, that are compatible with the Flex 12 Product Systems and compatible with, but not offered for sale, sold, or exported with, LED bulbs ("Flex 12 System Fixtures") (together with Trac 12 System Fixtures, "Low Voltage Trac Systems Fixtures"), including at least LED-compatible variations of at least the following fixtures: Arc 16; Concentricity 16; Gimbal 16; Lily 16; Cone 16; Disc Shade Pendant; Ellipse Shade Pendant; Flame Glass Shade Pendant; Flute Metal Shade Pendant; RLM Glass Shade Pendant; Short Cone Glass Shade Pendant; Tall Cone Glass Shade Pendant; Teardrop Glass Shade Pendant; Wrap Shade Pendant; and Tall Dome Series Pendant.

79.     Juno and Schneider manufacture, use, offer for sale, sell, and export AC-driven lighting systems that are compatible with LED fixtures.  On information and belief, such lighting systems include the following lines of Juno AC-driven lighting systems: its Trac-Master 120V One Circuit System; Trac-Master 120V Two Circuit System; its Trac-Master 120V Tube System; its Trac-Master 120V Recessed System; and its Trac-Lites One Circuit System (collectively, the "High Voltage Systems").

80.     On information and belief, Juno and Schneider manufacture, use, offer for sale, sell, and export components of the High Voltage Systems that enable compatibility with LED lighting products and components, including AC electronic transformers for

23

LED circuits, lighting tracks, LED circuit board assemblies, LED circuit board assembly housing, corresponding compatible circuitry, and components thereof.

81.     On information and belief, many such components are often incorporated into fixtures, also manufactured, used, offered for sale, sold, and exported by Juno and Schneider, compatible with the High Voltage Systems, compatible with an integrated AC electronic transformer, and compatible with, but not offered for sale, sold, or exported with, LED bulbs ("High Voltage Systems Fixtures"), including LED-compatible variations of at least the following fixtures: Cylindra Low Voltage MR16; Arc 16; Concentricity 16 Series; Cone 16; Gimbal 16; Lily 16; Conix Low Voltage MR16; Cast 16; Cone Low Voltage MR 16; Cubix Low Voltage MR16; Delta 200 Low Voltage MR16; Delta 200 Pendant Low Voltage MR16; Facet Low Voltage MR16; FlyBack Low Voltage MR16; Framing Projector Low Voltage MR16; Glacis Low Voltage MR16; Mamba Low Voltage MR16; Mini-Round Back Low Voltage MR16; Notch Back Low Voltage MR16; Open Back Gimbal Low Voltage MR 16 Series; Orb Low Voltage MR16; Pendant Notch Back Low Voltage MR16; Straps Low Voltage MR16; Studio I Low Voltage MR16; Studio II Low Voltage MR16; Theatrical Light Low Voltage MR16; Wireforms Low Voltage MR16; Wishbone Low Voltage MR16; Xanadu Low Voltage MR16; Gyrus Low Voltage MR16; Trapezia Low Voltage MR16; Dart Low Voltage MR11; Disc Shade Pendant; Ellipse Shade Pendant; Flame Glass Shade Pendant; Flute Metal Shade Pendant; RLM Glass Shade Pendant; Short Cone Glass Shade Pendant; Tall Cone Glass Shade Pendant; Teardrop Glass Shade Pendant; and Wrap Shade Pendant.

82.     On information and belief, Juno and Schneider manufacture, use, offer for sale, sell, and export lighting systems that are compatible with LED fixtures driven by a

self-contained AC electronic transformer. On information and belief, such lighting systems include at least the High Voltage Systems.

83. On information and belief, Juno and Schneider manufacture, use, offer for sale, sell, and export LED fixtures driven by a self-contained electronic transformer, in variations compatible with each of the High Voltage Systems, that include circuits that incorporate at least one LED circuit having at least one LED, driven by an AC electronic transformer, to or from which at least one additional LED circuit can be seamlessly added or removed ("Track Heads"), including LED-compatible variations of at least the following fixtures: Dolce Series Pendant; Medium Dome Series Pendant; Tear Drop Glass Series Pendant; Charlotte Series Pendant; Fargo Glass Series Pendant; Long Cone Glass Series Pendant; Medium Cylinder Series Pendant; Onyx Series Pendant; Tube Glass Series Pendant; and Cylinder Glass Shade Pendant; Quick Jack LED Cylinder MiniPendant Series; and Quick Jack LED Flute MiniPendant Series.

*Direct Infringement*

84. On information and belief, the Directly Infringing Low Voltage Systems and Track Heads (collectively, the "Directly Infringing Systems") directly infringe the '118 Patent.

85. By manufacturing, using, offering for sale, selling, and exporting the Directly Infringing Systems, Juno and Schneider have directly infringed, and continue to directly infringe, either literally or under the doctrine of equivalents, at least all claims of the '118 Patent in violation of 35 U.S.C. § 271.

86. On information and belief, Juno and Schneider have willfully infringed and continue to willfully infringe the '118 Patent because they either knew or should

have known that there was an objectively high risk of infringement by manufacturing, using, offering to sell, and/or selling the claimed system or its components in the United States without authority because Lynk Labs, as described in Paragraph 28, at least as early as April 2008, had notified Juno of its pursuit of patent protection for AC-driven LED technologies. Moreover, as described in Paragraphs, 34, 65, and 68, respectively, Lynk Labs: notified Juno of its patent position in May 2009; issued a December 2013 press release announcing issuance of the '118 Patent; and included the '118 Patent in its February 2014 Offering Memorandum to Juno which specifically identified the type of products made and sold by Juno as infringing the '118 Patent. Additionally, Lynk Labs asserted the '118 Patent by filing and serving on Juno the original Complaint in this Action on June 1, 2015. Lynk Labs also notified Schneider of its assertion of the '118 Patent by filing and serving on Schneider the Second Amended Complaint in this Action on October 9, 2015. Moreover, on April 5, 2016, Juno and Schneider's counsel received from Lynk Labs' counsel a draft Complaint asserting the '118 Patent against Juno and Schneider and alleging infringement of all the products named herein.

87. Juno and Schneider have received repeated and significant warnings from both Lynk Labs and third parties – for example, third parties seeking indemnification – that it could not market its products without a license from Lynk Labs. Juno originally sought a license from Lynk Labs for AC-driven LED technology, and thoroughly researched the contents of the '118 Patent specification in February 2009 as described in Paragraph 66. On information and belief, after having analyzed the '118 Patent claims, Juno and Schneider have infringed the '118 Patent despite knowing that there was an objectively high risk of patent infringement.

88.     As described in Paragraphs 12, 35, and 69, on information and belief, information regarding Lynk Labs received by Juno was often communicated by employees at Juno to employees at Schneider, including information regarding intellectual property strategy pertaining to Lynk Labs.   For this reason, all events notifying Juno described in Paragraphs 86 and 87 also notified Schneider on or around the same dates.

*Indirect Infringement*

89.     On information and belief, Juno and Schneider indirectly infringe the '118 Patent by actively inducing and/or contributing to infringement of others engaging in direct infringement.

90.     On information and belief, Juno and Schneider had actual knowledge of the '118 Patent no later than February 28, 2014, and likely much earlier, as described in Paragraphs 28, 34, and 65-68.  Moreover, Juno had knowledge of the confidential matter incorporated in the '118 Patent at least at the end of 2007, when Lynk Labs shared such information during the product design and development described in Paragraphs 22-24.

91.     As described in Paragraphs 12, 35, and 69, on information and belief, information regarding Lynk Labs received by Juno was often communicated by employees at Juno to employees at Schneider, including information regarding intellectual property strategy pertaining to Lynk Labs.   For this reason, all events providing actual knowledge of the '118 Patent to Juno also provided such actual knowledge to Schneider.

92.     On information and belief, Juno and Schneider had actual knowledge that their inducement of infringement and contributory infringement resulted in direct

infringement of the '118 Patent by: electrical distributors; contractors; lighting showrooms; and retailers (together with lighting showrooms, "Retailers"), including, for example, The Home Depot; and end users of AC-driven LED lighting systems. On information and belief, Juno had a long-standing business arrangement with its corporate parent Schneider whereby Juno sold to Schneider components of, or entire, infringing systems and Schneider manufactured, used, offered for sale, sold, and exported such systems.

*Inducement*

93.     On information and belief, Juno and Schneider induced, and continue to induce, infringement of the '118 Patent in violation of 35 U.S.C. § 271(b) by, without authority, and despite knowing such behavior will result in infringement of the '118 Patent: encouraging their third party OEM's to make and/or use components of the claimed system, including AC electronic transformers for LED circuits, Low Voltage Systems Tracks, Low Voltage Trac Systems Fixtures, and High Voltage Systems Fixtures (the "Material Components"), which may be used in connection with the Directly Infringing Systems and other directly infringing third party LED lighting systems; and selling components, including Material Components, which may be used in connection with the Directly Infringing Systems and other directly infringing third party LED lighting systems. On information and belief, Schneider also induced, and continues to induce, infringement of the '118 Patent by encouraging Juno to make, use, and/or sell components of the claimed system, including the Material Components.

94.     On information and belief, such third party OEM's sold, and continue to sell, Material Components to: electrical distributors that offer to sell and sell the Directly

Infringing Systems and other directly infringing third party LED lighting systems; contractors that offer to sell, sell, and use the Directly Infringing Systems and other directly infringing third party LED lighting systems; and Retailers that offer to sell, sell, and use the Directly Infringing Systems and other directly infringing third party LED lighting systems. For example, on information and belief, Juno and Schneider encourage Hatch, Norlux, and Citizen to produce and sell, respectively, AC electronic drivers, LED circuit board assemblies, and LED circuit board assemblies. In that event, Juno and Schneider induce direct infringement by electrical distributors, contractors, and Retailers, as described above, and other end users of such systems.

95.     On information and belief, such third party OEM's sold, and continue to sell, Material Components to: electrical distributors that offer to sell and sell Material Components to end users of the Directly Infringing Systems and other directly infringing third party LED lighting systems; contractors that offer to sell and sell Material Components to end users of the Directly Infringing Systems and other directly infringing third party LED lighting systems; and Retailers that offer to sell and sell Material Components to end users of the Directly Infringing Systems and other directly infringing third party LED lighting systems. For example, Juno and Schneider encourage Hatch, Norlux, and Citizen to produce and sell, respectively, AC electronic drivers, LED circuit board assemblies, and LED circuit board assemblies. In that event, Juno and Schneider induce direct infringement by end users of such systems.

96.     On information and belief, Juno and Schneider sold, and continue to sell, components, such as Material Components, to: electrical distributors that offer to sell and sell the Directly Infringing Systems and other directly infringing third party LED lighting

systems; contractors that offer to sell, sell, and use the Directly Infringing Systems and other directly infringing third party LED lighting systems; and Retailers that offer to sell, sell, and use the Directly Infringing Systems and other directly infringing third party LED lighting systems. In that event, Juno and Schneider induce direct infringement by electrical distributors, contractors, and Retailers, as described above, and other end users of such systems.

97. Juno and Schneider's acts of encouragement of end user direct infringement include: providing Material Components to contractors and Retailers, and intending such parties use, or other end users use, the Directly Infringing Systems and other directly infringing third party LED lighting systems; providing Material Components to electrical distributors, contractors, and Retailers, and intending such parties sell the Directly Infringing Systems and other directly infringing third party LED lighting systems; and providing instruction manuals, brochures, presentations, and information to the public for the Directly Infringing Systems and other directly infringing third party LED lighting systems that promote and/or demonstrate use of the Material Components, Directly Infringing Systems, and other directly infringing third party LED lighting systems in a manner that infringes one or more claims of the '118 Patent either literally or under the doctrine of equivalents.

98. Juno and Schneider formed a specific intent to infringe the '118 Patent at least when Juno, for example, agreed to indemnify its third party OEM's against infringement claims brought by Lynk Labs and, in all events, no later than the February 28, 2014, patent portfolio offering to Juno, as described in Paragraph 68.

*Contributory Infringement*

99.     On information and belief, Juno and Schneider have contributorily infringed, and continue to contributorily infringe, the '118 Patent by offering to sell and selling in the United States, components of the invention claimed by the '118 Patent, including Material Components, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the '118 Patent, and not staples, articles, or commodities of commerce suitable for substantial noninfringing use.

100.     On information and belief, Juno and Schneider sell components, such as Material Components, to electrical distributors, contractors, and Retailers, which may be used in connection with the Directly Infringing Systems or other directly infringing third party LED lighting systems, despite knowing that such components will result in infringement of the '118 Patent. In that event, Juno and Schneider contribute to the direct infringement of the '118 Patent, including: electrical distributors that offer to sell and sell the Directly Infringing Systems and other directly infringing third party LED lighting systems; contractors that offer to sell, sell, and use the Directly Infringing Systems and other directly infringing third party LED lighting systems; Retailers that offer to sell, sell, and use the Directly Infringing Systems and other directly infringing third party LED lighting systems; and other end users of the Directly Infringing Systems and other directly infringing third party LED lighting systems.

101.     The Material Components constitute material parts of the '118 Patent.

102.     On information and belief, Juno and Schneider knew, and know, that AC electronic transformers for LED circuits, Low Voltage Systems Tracks, Low Voltage

Trac Systems Fixtures, and High Voltage Systems Fixtures have no substantial noninfringing uses. The AC electronic drivers for LED circuits were specifically designed as components of AC-driven circuits that infringe the '118 Patent. Indeed, the first generation of such AC electronic drivers were specifically designed and developed by Lynk Labs, at Juno's request, for use in lighting systems that infringe the '118 Patent. The Low Voltage Systems Tracks and Low Voltage Trac Systems Fixtures are designed and marketed specifically for compatibility with the Directly Infringing Low Voltage Systems. The High Voltage Systems Fixtures are designed and marketed for use with directly infringing systems.

*Notice & Marking*

103.    Lynk Labs gave notice of infringement pursuant to 35 U.S.C. § 287(a), as described in Paragraph 28, at least as early as April 2008, when Lynk Labs notified Juno of its pursuit of patent protection for AC-driven LED technologies. Moreover, as described in Paragraphs 34, 65, and 68 respectively, Lynk Labs notified Juno of its patent position in May 2009; issued a December 2013 press release announcing issuance of the '118 Patent; and included the '118 Patent in its February 2014 Offering Memorandum to Juno which specifically identified the type of products made and sold by Schneider and its former subsidiary Juno, as infringing the '118 Patent. Additionally, Lynk Labs asserted the '118 Patent by filing and serving on Juno the original Complaint in this Action on June 1, 2015. Lynk Labs also notified Schneider of its assertion of the '118 Patent by filing and serving on Schneider the Second Amended Complaint in this Action on October 9, 2015. Moreover, on April 5, 2016, Juno and Schneider's counsel received from Lynk Labs' counsel a draft Complaint asserting the '118 Patent against Juno and

Schneider and alleging infringement of all the products named herein. Additionally, Lynk Labs provides notice of infringement by serving this Complaint on Schneider.

104. As described in Paragraphs 12, 35, and 69, on information and belief, information regarding Lynk Labs received by Juno was often communicated by employees at Juno to employees at Schneider, including information regarding intellectual property strategy pertaining to Lynk Labs. For this reason, all events providing actual knowledge of the '118 Patent to Juno also provided such actual knowledge to Schneider.

105. Lynk Labs has complied with the marking requirements of 35 U.S.C. § 287 with respect to the '118 Patent.

*Damage*

106. Lynk Labs has been damaged and irreparably harmed by Juno and Schneider's direct and indirect infringement of the '118 Patent, and will continue to be damaged and irreparably harmed absent relief.

107. As described in Paragraph 56, Schneider, as a consequence of the sale of Juno Manufacturing LLC to Acuity or for other reasons, may be liable for some or all of Juno's debts and liabilities related to this Action, including Juno's direct and indirect infringement of the '118 Patent.

**COUNT II – INFRINGEMENT OF THE '855 PATENT**

108. Paragraphs 1 through 107 are incorporated by reference as though fully stated herein.

*Juno and Schneider's Sale of Juno Products*

109.     Juno and Schneider manufacture, use, offer for sale, sell, and export AC-driven LED lighting systems, including the Juno Trac 12 Product Systems.  The Trac 12 Product Systems include lighting systems incorporating the LED Mini-Flood Fixture (the "Mini-Flood").

110.     Juno and Schneider manufacture, use, offer for sale, sell, and export the Mini-Flood.

*Direct Infringement*

111.     On information and belief, the Mini-Flood directly infringes the '855 Patent.

112.     By manufacturing, using, offering for sale, selling, and exporting the Mini-Flood, Juno and Schneider have directly infringed, and continue to directly infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '855 Patent in violation of 35 U.S.C. § 271.

*Notice & Marking*

113.     Lynk Labs gave Juno notice of infringement pursuant to 35 U.S.C. § 287(a), on June 1, 2015, by filing Northern District of Illinois Case No. 15-cv-04833 and serving the original Complaint on Juno.  As described in Paragraphs 12, 35, and 69, on information and belief, information regarding Lynk Labs received by Juno was often communicated by employees at Juno to employees at Schneider, including information regarding intellectual property strategy pertaining to Lynk Labs.  For this reason, notice of infringement was also given to Schneider on or around June 1, 2015.  Additionally, Lynk Labs notified Schneider of its assertion of the '118 Patent at least by filing and

serving on Schneider the Second Amended Complaint in this Action on October 9, 2015. Moreover, on April 5, 2016, Juno and Schneider's counsel received from Lynk Labs' counsel a draft Complaint asserting the '855 Patent against Juno and Schneider and alleging infringement of all the products named herein. Finally, Lynk Labs gives Schneider notice of infringement by serving this Complaint.

114. Lynk Labs has complied with the marking requirements of 35 U.S.C. § 287 with respect to the '855 Patent.

*Damage*

115. Lynk Labs has been damaged and irreparably harmed by Juno and Schneider's direct infringement of the '855 Patent, and will continue to be damaged and irreparably harmed absent relief.

116. As described in Paragraph 56, Schneider, as a consequence of the sale of Juno Manufacturing LLC to Acuity or for other reasons, may be liable for some or all of Juno's debts and liabilities related to this Action, including Juno's direct and indirect infringement of the '855 Patent.

**COUNT III – INFRINGEMENT OF THE '905 PATENT**

117. Paragraphs 1 through 116 are incorporated by reference as though fully stated herein.

*Juno and Schneider's Sale of Juno Products*

118. Juno and Schneider manufacture, use, offer for sale, sell, and export AC-driven LED lighting systems driven by AC electronic transformers. On information and belief, such lighting systems include at least the Juno Solo-Task Product Systems.

119.    Juno and Schneider manufacture, use, offer for sale, sell, and export the Solo-Task Product Systems.

*Direct Infringement*

120.    On information and belief, the Solo-Task Product Systems directly infringe the '905 Patent.

121.    By manufacturing, using, offering for sale, selling, and exporting the Solo-Task Product Systems, Juno and Schneider have directly infringed, and continue to directly infringe, either literally or under the doctrine of equivalents, at least claim 1 of the '905 Patent in violation of 35 U.S.C. § 271.

122.    On information and belief, Juno and Schneider have willfully infringed and continue to willfully infringe the '905 Patent because it either knew or should have known that there was an objectively high risk of infringement by making, using, offering to sell, and/or selling the claimed system or its components in the United States without authority because Lynk Labs, as described in Paragraph 28, at least as early as April 2008, had notified Juno of its pursuit of patent protection for AC-driven LED technologies.  Moreover, as described in Paragraphs 34, 65, and 68, respectively, Lynk Labs similarly: notified Juno of its patent position in May 2009; and included the '905 Patent in its February 2014 Offering Memorandum to Juno which identified classes of LED lighting products and systems related to claims of the '905 Patent.  Additionally, on April 5, 2016, Juno and Schneider's counsel received from Lynk Labs' counsel a draft Complaint asserting the '905 Patent against Juno and Schneider and alleging infringement of all the products named herein.  Finally, Lynk Labs provides notice of infringement by serving this Complaint on Schneider.

123.    As described in Paragraphs 12, 35, and 69, on information and belief, information regarding Lynk Labs received by Juno was often communicated by employees at Juno to employees at Schneider, including information regarding intellectual property strategy pertaining to Lynk Labs.   For this reason, all events notifying Juno described in Paragraph 122 also notified Schneider on or around the same dates.

124.    Juno and Schneider have received repeated and significant warnings from Lynk Labs and third parties – for example, third parties seeking indemnification – that it could not market its products without a license from Lynk Labs.  Indeed, Juno originally sought a license from Lynk Labs for AC-driven LED technology as described in Paragraph 29.  On information and belief, Juno and Schneider are well aware of, and have analyzed, the '905 Patent claims.  On information and belief, after having analyzed the '905 Patent claims, Juno and Schneider have infringed the '905 Patent despite knowing that there was an objectively high risk of patent infringement.

*Indirect Infringement*

125.    On information and belief, Juno and Schneider indirectly infringe the '905 Patent by actively inducing and/or contributing to infringement of others engaging in direct infringement.

126.    On information and belief, Juno and Schneider had actual knowledge of the '905 Patent no later than February 28, 2014, and likely much earlier, as described in Paragraphs 28, 34, and 65-68.

127.    As described in Paragraphs 12, 35, and 69, on information and belief, information regarding Lynk Labs received by Juno was often communicated by

employees at Juno to employees at Schneider, including information regarding intellectual property strategy pertaining to Lynk Labs. For this reason, all events providing actual knowledge of the '905 Patent to Juno also provided such actual knowledge to Schneider.

128. On information and belief, Juno and Schneider had actual knowledge that their inducement of infringement and contributory infringement resulted in direct infringement of the '905 Patent by: electrical distributors; contractors; lighting showrooms; and retailers, including, for example, The Home Depot; and end users of AC-driven LED lighting systems.

129. On information and belief, Juno and Schneider had actual knowledge that their inducement of infringement and contributory infringement resulted in direct infringement of the '905 Patent by: electrical distributors; contractors; lighting showrooms; retailers, including, for example, The Home Depot; and end users of AC-driven LED lighting systems. On information and belief, Juno had a long-standing business arrangement with its corporate parent Schneider whereby Juno sold to Schneider components of, or entire, infringing systems and Schneider manufactured, used, offered for sale, sold, and exported such systems.

*Inducement*

130. On information and belief, Juno and Schneider induced, and continue to induce, infringement of the '905 Patent in violation of 35 U.S.C. § 271(b) by, without authority, and despite knowing such behavior will result in infringement of the '905 Patent: encouraging their third party OEM's to make and/or use components of the claimed system, including AC electronic transformers for LED circuits and Solo-Task

LED Luminaires, which may be used in connection with the Solo-Task Product Systems and other directly infringing third party LED lighting systems; and selling components, including AC electronic transformers for LED circuits and Solo-Task LED Luminaires, which may be used in connection with the Solo-Task Product Systems and other directly infringing third party LED lighting systems. On information and belief, Schneider also induced, and continues to induce, infringement of the '905 Patent by encouraging Juno to make, use, and/or sell components of the claimed system, including AC electronic transformers and Solo-Task LED Luminaires.

131.    On information and belief, such third party OEM's sold, and continue to sell, AC electronic transformers and Solo-Task LED Luminaires to: electrical distributors that offer to sell and sell the Solo-Task Product Systems and other directly infringing third party LED lighting systems; contractors that offer to sell, sell, and use the Solo-Task Product Systems and other directly infringing third party LED lighting systems; and Retailers that offer to sell, sell, and use the Solo-Task Product Systems and other directly infringing third party LED lighting systems. For example, on information and belief, Juno and Schneider encourage Hatch, Norlux, and Citizen to produce and sell, respectively, AC electronic drivers, LED circuit board assemblies, and LED circuit board assemblies. In that event, Juno and Schneider induce direct infringement by electrical distributors, contractors, and Retailers, as described above, and other end users of such systems.

132.    On information and belief, such third party OEM's sold, and continue to sell, AC electronic transformers and Solo-Task LED Luminaires to: electrical distributors that offer to sell and sell AC electronic transformers and Solo-Task LED Luminaires to

end users of the Solo-Task Product Systems and other directly infringing third party LED lighting systems; contractors that offer to sell and sell AC electronic transformers and Solo-Task LED Luminaires to end users of the Solo-Task Product Systems and other directly infringing third party LED lighting systems; and Retailers that offer to sell and sell AC electronic transformers and Solo-Task LED Luminaires to end users of the Solo-Task Product Systems and other directly infringing third party LED lighting systems. For example, on information and belief, Juno and Schneider encourage Hatch, Norlux, and Citizen to produce and sell, respectively, AC electronic drivers, LED circuit board assemblies, and LED circuit board assemblies. In that event, Juno and Schneider induce direct infringement by end users of such systems.

133. On information and belief, Juno and Schneider sold, and continue to sell, components, such as AC electronic transformers and Solo-Task LED Luminaires, to: electrical distributors that offer to sell and sell the Solo-Task Product Systems and other directly infringing third party LED lighting systems; contractors that offer to sell, sell, and use the Solo-Task Product Systems and other directly infringing third party LED lighting systems; and Retailers that offer to sell, sell, and use the Solo-Task Product Systems and other directly infringing third party LED lighting systems. In that event, Juno and Schneider induce direct infringement by electrical distributors, contractors, and Retailers, as described above, and other end users of such systems.

134. Juno and Schneider's acts of encouragement of end user direct infringement include: providing AC electronic transformers and Solo-Task LED Luminaires to contractors and Retailers, and intending such parties use, or other end users use, the Solo-Task Product Systems and other directly infringing third party LED lighting

systems; providing AC electronic transformers and Solo-Task LED Luminaires to electrical distributors, contractors, and Retailers, and intending such parties sell the Solo-Task Product Systems and other directly infringing third party LED lighting systems; and providing instruction manuals, brochures, presentations, and information to the public for the Solo-Task Product Systems and other directly infringing third party LED lighting systems that promote and/or demonstrate use of the AC electronic transformers and Solo-Task LED Luminaires, Solo-Task Product Systems, and other directly infringing third party LED lighting systems in a manner that infringes one or more claims of the '905 Patent either literally or under the doctrine of equivalents.

135. Juno and Schneider formed a specific intent to infringe the '905 Patent at least when, for example, Juno agreed to indemnify its third party OEM's against infringement claims brought by Lynk Labs and, in all events, no later than the February 28, 2014, patent portfolio offering to Juno, as described in Paragraph 68.

*Contributory Infringement*

136. On information and belief, Juno and Schneider have contributorily infringed, and continue to contributorily infringe, the '905 Patent by offering to sell and selling in the United States, components of the invention claimed by the '905 Patent, including AC electronic transformers and Solo-Task LED Luminaires, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of the '905 Patent, and not staples, articles, or commodities of commerce suitable for substantial noninfringing use.

137. On information and belief, Juno and Schneider sell components, such as AC electronic transformers and Solo-Task LED Luminaires, to electrical distributors,

contractors, and Retailers, which may be used in connection with the Solo-Task Product Systems or other directly infringing third party LED lighting systems, despite knowing that such components will result in infringement of the '905 Patent.  In that event, Juno and Schneider contribute to the direct infringement of the '905 Patent, including: electrical distributors that offer to sell and sell the Solo-Task Product Systems and other directly infringing third party LED lighting systems; contractors that offer to sell, sell, and use the Solo-Task Product Systems and other directly infringing third party LED lighting systems; Retailers that offer to sell, sell, and use the Solo-Task Product Systems and other directly infringing third party LED lighting systems; and other end users of the Solo-Task Product Systems and other directly infringing third party LED lighting systems.

138.    AC electronic transformers and Solo-Task LED Luminaires constitute material parts of the '905 Patent.

139.    On information and belief, Juno and Schneider knew, and know, that AC electronic transformers and Solo-Task LED Luminaires have no substantial noninfringing uses.  The AC electronic drivers for LED circuits were specifically designed as components of AC-driven circuits that infringe the '905 Patent.  Indeed, the first generation of such AC electronic drivers were specifically designed and developed by Lynk Labs, at Juno's request, for use in lighting systems that infringe the '905 Patent. The Solo-Task LED Luminaries are designed and marketed specifically for compatibility with the Solo-Task Product Systems.

*Notice & Marking*

140.    Lynk Labs gave notice of infringement pursuant to 35 U.S.C. § 287(a), as described in Paragraph 28, at least as early as April 2008, when Lynk Labs notified Juno of its pursuit of patent protection for AC-driven LED technologies.   Moreover, as described in Paragraphs 34, 65, and 68, respectively, Lynk Labs similarly: notified Juno of its patent position in May 2009; and included the '905 Patent in its February 2014 Offering Memorandum to Juno which identified classes of LED lighting products and systems related to claims of the '905 Patent.   Moreover, on April 5, 2016, Juno and Schneider's counsel received from Lynk Labs' counsel a draft Complaint asserting the '905 Patent against Juno and Schneider and alleging infringement of all the products named herein.   Lynk Labs provides notice of infringement by serving this Complaint on Schneider.

141.    As described in Paragraphs 12, 35, and 69, on information and belief, information regarding Lynk Labs received by Juno was often communicated by employees at Juno to employees at Schneider, including information regarding intellectual property strategy pertaining to Lynk Labs.   For this reason, all events providing actual knowledge of the '905 Patent to Juno also provided such actual knowledge to Schneider.

142.    Lynk Labs has complied with the marking requirements of 35 U.S.C. § 287 with respect to the '905 Patent.

*Damage*

143.     Lynk Labs has been damaged and irreparably harmed by Juno and Schneider's direct infringement of the '905 Patent, and will continue to be damaged and irreparably harmed absent relief.

144.     As described in Paragraph 56, Schneider, as a consequence of the sale of Juno Manufacturing LLC to Acuity or for other reasons, may be liable for some or all of Juno's debts and liabilities related to this Action, including Juno's direct and indirect infringement of the '905 Patent.

## COUNT III – BREACH OF CONTRACT

145.     Paragraphs 1 through 144 are incorporated by reference as though fully stated herein.

146.     The Agreement was and is a valid, enforceable contract between Juno and Lynk Labs.

147.     Juno breached the Agreement by unauthorized utilization of Lynk Labs' confidential information concerning technical knowhow concerning design and manufacture of AC-driven lighting products and components and technical knowhow concerning various forms of AC-driven LED circuits in development and production of lighting systems that incorporate AC-driven LED's, including at least those systems described in Paragraph 39.

148.     Juno breached the Agreement by unauthorized disclosure of Lynk Labs' confidential information concerning technical knowhow concerning design and manufacture of AC-driven lighting products and components, such as AC electronic drivers, AC-driven LED circuits, AC-driven LED circuit board assemblies, with third

44

party OEM's such as Norlux, Hatch, and Citizen, and contracting of such third party OEM's to produce such components, at least as described in Paragraph 33.

149.    Juno breached the Agreement by unauthorized utilization of the technology business plan/roadmap developed by Lynk Labs for commercial implementation of AC-driven LED products.

150.    Juno breached the Agreement by unauthorized utilization of confidential information concerning the proper spatial separation of LED's in development and production of the Mini-Flood.

151.    Juno breached the Agreement by unauthorized disclosure of confidential information concerning the proper spatial separation of LED's with third party OEM's, such as Norlux, to produce LED circuit board assemblies for use in the Mini-Flood.

152.    Juno breached the Agreement by unauthorized utilization of confidential information concerning the wedge-shaped emitter area of an LED circuit board assembly housing in development and production of LED fixtures incorporating such wedge-shaped emitter areas.

153.    Juno breached the Agreement by, without authorization, incorporating in the '144 Patent confidential information regarding wedge-shaped emitter areas in LED circuit board assembly housing.

154.    Juno breached the Agreement by unauthorized utilization of confidential information concerning the practical design of the LED fixture originally designed for use in tracks of the Trac 12 lighting system, by developing and producing LED fixtures incorporating such design.

155.    Juno breached the Agreement by, without authorization, incorporating in the '499 Patent confidential information regarding the practical design of the LED fixture originally designed for use in tracks of the Trac 12 lighting system, and using that confidential information to design and market commercial products.

156.    Juno breached the Agreement by, without authorization, incorporating in the '597 Patent confidential information regarding the design of LED circuit board assemblies and their incorporation into the tracks of track lighting systems.

157.    Juno breached the Agreement by unauthorized utilization of confidential information concerning the design of LED circuit board assemblies and their incorporation into the tracks of track lighting systems, by developing and producing LED lighting systems, PCB's, and modules incorporating such design.

158.    Lynk Labs performed all of its obligations under the Agreement.

159.    As a legal and proximate cause of Juno's breach of the Agreement, Lynk Labs sustained and continues to sustain substantial economic damages, due in part to its loss of potential customers and business partners, the loss and devaluation of Lynk Labs' confidential information, and the loss of its first mover advantage.

160.    As described in Paragraph 56, Schneider, as a consequence of the sale of Juno Manufacturing LLC to Acuity or for other reasons, may be liable for some or all of Juno's debts and liabilities related to this Action, including Juno's breach of the Agreement.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Lynk Labs prays that this Court:

A.      Enter a judgment that Juno and Schneider have infringed and continue to infringe one or more claims of the '118, '855, and '905 Patents;

B.      Enter a judgment that Juno and Schneider have willfully infringed and continue to willfully infringe one or more claims of the '118 and '905 Patents;

C.      Award Lynk Labs damages in an amount sufficient to compensate Lynk Labs for Juno and Schneider's infringement of the '118, '855 Patents, and '905 Patents, but no less than a reasonable royalty;

D.      Award Lynk Labs its attorneys' fees, costs, and expenses pursuant to 35 U.S.C. § 285;

E.      Award Lynk Labs prejudgment interest pursuant to 35 U.S.C. § 284;

F.      Award Lynk Labs treble damages pursuant to 35 U.S.C. § 284 as a result of Juno and Schneider's willful conduct;

G.      Enter a judgment that Juno has breached the Agreement;

H.      Award Lynk Labs damages in an amount sufficient to compensate Lynk Labs for Juno's breach of the Agreement;

I.      Award Lynk Labs punitive damages in an amount to punish Juno from engaging in similar breaches of contract in the future;

J.      Award Lynk Labs its attorney's fees, costs, and expenses pursuant to the Agreement;

K.      Grant Lynk Labs such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Lynk Labs hereby demands a jury trial on all issues appropriately triable by a jury.

Dated: April 25, 2016                 Respectfully submitted,

                                      */s/  James A. Shimota*
                                      James A. Shimota

                                      James A. Shimota (IL Bar No. 6270603)
                                      Aaron C. Taggart (IL Bar No. 6302068)
                                      Braden J. Tilghman (IL Bar No. 6314143)
                                      **HAYNES AND BOONE LLP**
                                      180 North LaSalle Street, Suite 2215
                                      Chicago, Illinois 60601
                                      Telephone:  312-216-1620
                                      Facsimile:  312-216-1621
                                      Jim.Shimota@haynesboone.com
                                      Aaron.Taggart@haynesboone.com
                                      Braden.Tilghman@haynesboone.com

                                      ***Counsel for Plaintiff Lynk Labs, Inc.***